1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11   4WEB, INC. and 4WEB, LLC, | Case No.: 24-CV-1021 JLS (MMP) |
| 12                    Plaintiffs, | **ORDER ON CLAIM CONSTRUCTION** |
| 13   v. | |
| 14   NUVASIVE, INC., | (ECF Nos. 113, 114, 117, 124) |
| 15                    Defendant. | |

16

17          Presently before the Court are Plaintiffs 4WEB, Inc. and 4Web, LLC (collectively,
18   "4Web"), and Defendant NuVasive, Inc.'s Opening Claim Construction Briefs (ECF
19   No. 113 ("Pl.'s Opening Br.") and ECF No. 114 ("Def.'s Opening Br.")) and Responsive
20   Claim Construction Briefs (ECF No. 117 ("Pl.'s Resp. Br.") and ECF No. 124 ("Def.'s
21   Resp. Br.")).   The Court heard oral argument, including technology tutorials, on
22   February 6, 2025, and the matter was thereafter taken under submission.   ECF No. 127.
23   Having carefully considered the Parties' arguments, the evidence, and the law, the Court
24   rules as follows.

25                                  **BACKGROUND**

26          This is a patent infringement case in which 4Web asserts NuVasive infringes nine
27   of 4Web's United States Patents: U.S. Patent Nos. 8,430,930 (the "'930 patent");
28   9,999,516 (the "'516 patent"); 9,545,317 (the "'317 patent"); 11,278,421 (the "'421

1

patent"); 9,271,845 (the "'845 patent"); 9,549,823 (the "'823 patent"); 9,572,669 (the "'669 patent"); 10,849,756 (the "'756 patent"); and 9,636,226 (the "'226 patent") (collectively, "Patents-in-Suit"). *See* ECF No. 112 at 2.

## I.     The Parties

4Web is a medical device company that claims to have "developed and obtained FDA approval for the first 3D-printed spinal implant in 2011." Pl.'s Opening Br. at 2. Recognizing flaws in then-existing spinal implants, which "facilitate fusion between vertebrae for the treatment of a variety of spinal conditions, including issues relating to instability or pain," *id.* at 1, 4Web devoted "years of research and development" to advancing novel implants that improved upon legacy technology, *id.* at 3. Specifically, legacy implants were constructed using a monolithic structure, meaning they "were typically dense, block-like structures." *Id.* at 2. Finding these legacy products to result in "suboptimal fusions" when implanted into the human spine,[1] 4Web developed a "truss-implant technology," discussed in more detail below, "that creates high-strength, lightweight implant structures" addressing the "shortcomings of the solid, legacy implants discussed above." *Id.* at 3.

4Web alleges NuVasive is a San Diego-based company that "makes, sells, offers for sale in the United States, and imports into the United States, medical equipment and devices, including spinal implants." ECF No. 21 ("FAC") ¶¶ 4–5. The Parties allegedly engaged in discussions in 2015 regarding their "respective visions for advancing spine surgery, and potential partnership opportunities." *Id.* ¶ 49. When licensing negotiations

---

[1] 4Web described the three shortcomings in its Opening Brief as follows:

> (i) stress-shielding, where an implant is overly-rigid such that it shields the surrounding bone from beneficial stress and leads to the loss of bone density; (ii) point loading, where a limited contact area between the implant and bone tissue causes high-stress contacts points that cause damages to the bone; and (iii) bone subsidence, where the implant penetrates into adjacent bone, reducing the corrected disc height and negatively impacting clinical outcomes.

Pl.'s Opening Br. at 2.

allegedly ended after "4WEB and NuVasive could not agree on a valuation for a business arrangement," *id.* ¶ 52, NuVasive released its Modulus line of spinal implants, including the Modulus ALIF, Modulus Cervical, Modulus XLIF, Modulus TLIF-0, and Modulus TLIF-A (collectively, "Accused Products"), *id.* ¶ 62.  4Web claims the Accused Products infringe the Patents-in-Suit.  *See generally* FAC.

## II.    The Patents-in-Suit

### A.    The '930, '516, '317, and '421 Patents

The '930, '516, '317, and '421 Patents are entitled, respectively, "Truss Implant," "Implant Device Having a Non-Planar Surface," "Implant Interface System and Device," and "Implant Device Having Curved or Arced Struts."  Plaintiffs refer to these patents as the "Web Structure Family," and the Court adopts their nomenclature.  The patents in the Web Structure Family are all related and share a common specification; accordingly, the Court will cite the specification of the '421 Patent only.

As background, the Web Structure Family teaches that "implants may be used in the spine to support and/or replace damaged tissue between the vertebrae in the spine." Ex. D, FAC ("'421 Patent," ECF No. 21-4) at col. 1:23–25.   Implants provide weight-bearing support in the spine and facilitate bone growth "around and through the implant to at least partially fuse the two vertebrae for long-term support."   *Id.* at col. 1:25–29.   The specification notes drawbacks resulting from implants with "relatively large rims," however, in that "large rims may impede bone growth and reduce the size of the bone column fusing the superior and inferior vertebral bodies."   *Id.* at col. 1:33–36.   Other implants, the specification notes, "include open channels," but these channels can be suboptimal because they "may increase the pressure on smaller areas of the vertebral endplates and may potentially lead to stress-risers in the vertebral endplates."  *Id.* at col. 1:42–44.  Further, implants often contain bone graft material, but "the open column design of implants may reduce the likelihood of bone graft material from securing itself to the implant which could result in a bio-mechanical cooperation that is not conducive to promoting good fusion."  *Id.* at col. 1:46–50.

3

The invention of the Web Structure Family purports to improve upon these drawbacks by using "a web structure, including a space truss, configured to interface with human bone tissues." *Id.* at col. 2:1–3.  As defined in the specification, a "truss" is "a structure having one or more elongate struts connected at joints referred to as nodes." *Id.* at col. 5:1–2.  Building upon that, a "planar truss" is defined as "a truss structure where all of the struts and nodes lie substantially within a single two-dimensional plane." *Id.* at col. 5:8–10.  The specification further defines a "space truss" as "a truss having struts and nodes that are not substantially confined in a single two-dimensional plane." *Id.* at col. 5:20–22.  The web structure taught by the Web Structure Family "is configured to provide support along at least four planes of the implant to bear against tensile, compressive, and shear forces acting on the implant." *Id.* at col. 2:40–42.  This configuration can then be used "as a spinal implant, a corpectomy device, in a hip replacement, in a knee replacement, in a long bone reconstruction scaffold, foot and ankle implant, shoulder implant, a joint replacement or in a cranio-maxifacial implant." *Id.* at col. 2:54–58.

Figure 1A of the '421 Patent shows one embodiment of the Web Structure Family:



FIG. 1A

As shown in Figure 1A, the web structure provides support by extending throughout the implant.  *Id.* at col. 6:4–5.  In so doing, the implant is supported "against tensile, compressive, and shear forces" by including "an internal web structure that includes a space truss having at least a portion of the space truss surrounded by an

///

4

external truss structure that includes one or more planar trusses formed with a plurality of planar truss units that lie substantially in a single plane." *Id.* at col. 6:8–9, 6:23–28.

### B.    The '845, '823, '669, and '756 Patents

The '845, '823, '669, and '756 Patents are entitled, respectively, "Programmable Implants and Methods of Using Programmable Implants to Repair Bone Structures," "Programmable Implant Having Curved or Arced Struts," "Programmable Implant Having an Angled Exterior Surface," and "Programmable Implant." Plaintiffs refer to these patents as the "Microstrain Family," and the Court adopts their nomenclature. The patents in the Microstrain Family are all related and share a common specification; accordingly, the Court will cite the specification of the '845 Patent only.

As background, the '845 Patent teaches that implants can be composed of "a web structure that is formed from a plurality of struts joined at nodes, wherein the web structure is configured to interface with human bone tissue." Ex. E, FAC ("'845 Patent," ECF No. 21-5) at col. 2:6–8. At the interface between implant and human bone tissue, osteoblasts, which are cells that form new bone, "become attached to the struts of a web structure." *Id.* at col. 14:19–20. Prior art teaches that it "is known that osteoblasts under an appropriate load produce bone morphogenetic protein ('BMP')," which "signal the formation of bone (i.e., an osteogenetic response)." *Id.* at col. 14:4–8. Thus, prior art teaches that "by increasing the production of one or more BMPs the osteogentic [sic] response to an implant is increased, creating an implant that is integrated into the newly formed bone." *Id.* at col. 14:9–11.

The '845 Patent adds to the prior art by teaching that, when "used as a bone implant, web structures as described herein may promote the growth of bone in and around the web structure, in part, because of the enhanced BMP production." *Id.* at col. 14:16–19. The web structure accomplishes this function because of a microstrain exerted in the struts, which "causes localized deformation which in turn transfers the strain to the adhered osteoblasts which cause the osteoblasts to elute BMP." *Id.* at col. 14:20–23. This enhanced BMP production "leads to accelerated healing and

5

achieving a mature fusion in a shorter amount of time as compared to predicate devices." *Id.* at col. 14:35–37.  In one embodiment, the '845 Patent teaches that the "diameter and/or length of the struts and/or the density of the web structure are predetermined such that when the web structure is in contact with the bone structure, its matrix, or the cells from which it is derived, at least a portion of the struts create a microstrain, that is transferred to the adherent osteoblasts, bone matrix, or lamellar tissue," which can be "optimized to known load-response dynamics . . . ." *Id.* at col. 2:8–14, 2:19–20.

Figure 11C of the '845 Patent shows the increased production of BMP as a result of a microstrain exerted on an osteoblast:



*FIG. 11C*

### C.    The '226 Patent

The '226 Patent is entitled "Traumatic Bone Fracture Repair Systems and Methods."  Plaintiffs refer to this patent as the "Channel Patent," and the Court adopts their nomenclature.

As background, the '226 Patent teaches that "one or more truss structures may be disposed on a contact surface of the intervertebral implant to facilitate bone growth that enhances coupling of the intervertebral implant to the bony structure."  Ex. K, FAC ("'226 Patent," ECF No. 21-11) at col. 13:42–45.  The implant accomplishes this coupling by "includ[ing] one or more struts that extend from the contact surface to define an open space for bone growth therethrough, thereby enabling bone through growth to interlock the bone structure and the truss structure with one another . . . ."  *Id.*

24-CV-1021 JLS (MMP)

at col. 13:46–49.    However, the prior art notes that this technique suffers from a drawback in that "interlocking bone through growth may inhibit movement between the implant and the bony structure which could otherwise lead to loosening, migration, subsidence, or dislodging of the implant from the intended position."    *Id.* at col. 13:51–55.

Figure 10C of the '226 Patent shows one embodiment of the Channel Patent:



*FIG. 10C*

As shown in Figure 10C of the Channel Patent, the implant may include "[o]ne or more channels . . . in the web structure" such that "[f]asteners may be coupled to any part of the implant structure to secure the implant to the bone."    *Id.* at col. 14:20, 14:13–14. "The channels may be substantially tubular to receive a cylindrical fastener," or, alternatively, the channels "may be substantially threaded, having a threading that is complementary to threading of a bone screw."    *Id.* at col. 14:26–27, 14:32–34.    This invention improves upon the prior art by teaching a new technique that allows for optimized clinical solutions for certain circumstances, such as "fractures of the long bones," which are best repaired "by inserting a rod or nail through the hollow center of the bone that normally contains some marrow."    *Id.* at col. 14:7–9.

## LEGAL STANDARD

### I.    General Principles

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"    *Phillips v. AWH Corp.*,

7

415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

A determination of infringement therefore "involves a two-step analysis. 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.'" *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1320 (Fed. Cir. 2003) (quoting *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)).

The first step, commonly known as claim construction, is presently before the Court. The Court construes patent claims ultimately as a matter of law, although "subsidiary factfinding is sometimes necessary." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996) ("[J]udges, not juries, are the better suited to find the acquired meaning of patent terms."). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Accordingly, a claim should be construed in a manner that "stays true to the claim language and most naturally aligns with the patent's description of the invention[.]" *Id.*

"In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). These sources "include both intrinsic evidence (*e.g.*, the patent specification and file history) and extrinsic evidence (*e.g.*, expert testimony)." *Id.* It is well-settled that in construing an asserted claim, a court "look[s] first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Id.* (citation omitted); *see also Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014) ("In construing claims, this court relies primarily on the claim language, the specification, and the prosecution history.").

24-CV-1021 JLS (MMP)

The claim construction inquiry "begins and ends in all cases with the actual words of the claim." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 365 F.3d 1299, 1303 (Fed. Cir. 2004) (quotations omitted); *see also Vitronics*, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."). The words of a claim should generally be "given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [('POSITA')] in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

"[S]econd, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines them by implication." *Id.* at 1582. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*; *see also Phillips*, 415 F.3d at 1317 ("It is . . . entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims.").

"Third, the court may also consider the prosecution history of the patent, if in evidence." *Vitronics*, 90 F.3d at 1582. The history consists of the "complete record of all proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Id.* "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the

9

applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583. A court is also authorized, however, to consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Although a court may consider evidence extrinsic to the patent and prosecution history, such evidence is considered "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms[.]" *Phillips*, 415 F.3d at 1317–18 (internal quotation marks and citations omitted); *see also Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("Extrinsic evidence, such as expert testimony, may be useful in claim construction, but it should be considered in the context of the intrinsic evidence.").

Extrinsic evidence may not be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324. In cases where it is necessary for a court to consult extrinsic evidence "in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period," and such subsidiary facts "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." *Teva*, 574 U.S. at 332.

## II. Indefiniteness

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112 ¶ 2. A claim fails to satisfy this statutory requirement and is thus invalid

for indefiniteness if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The indefiniteness requirement serves "to afford clear notice of what is claimed, thereby apprising the public of what is still open to them," *id.* at 909 (internal quotations and citations omitted), while "strik[ing] a 'delicate balance' between 'the inherent limitations of language' and providing" a clear boundary surrounding the claimed invention, *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quoting *Nautilus*, 572 U.S. at 909).

Indefiniteness is a "question of law that may contain underlying facts," *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1370 (Fed. Cir. 2018), and it is evaluated from the perspective of someone skilled in the relevant art at the time the patent was filed, *Nautilus*, 890 F.3d at 909. "[A] party challenging patent validity on indefiniteness grounds carries the burden of proof," *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017), the standard for which demands clear and convincing evidence, *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). Additionally, the "general principles of claim construction apply" to the issue of indefiniteness. *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 902 (Fed. Cir. 2020) (citing *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377–78 (Fed. Cir. 2015)). Thus, indefiniteness analysis "involves consideration of primarily the intrinsic evidence, *viz.*, the claim language, the specification, and the prosecution history," *Biosig*, 783 F.3d at 1378 (quoting *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010)), though "courts are permitted to consider extrinsic evidence" so long as the extrinsic evidence is not "used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence,'" *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1380 (Fed. Cir. 2016) (quoting *Phillips*, 415 F.3d at 1324).

/ / /

/ / /

11

# DISCUSSION

The Parties dispute three groupings of terms from the Patents-in-Suit. These groupings are, as the Court will refer to them, the "Microstrain Terms," the "Central Portion Term," and the "Substantially Parallel Term." NuVasive argues that all terms from the above groupings are indefinite. 4Web, on the other hand, contends that all terms from the above groupings are not indefinite; rather, each term should be given its plain and ordinary meaning. The Court will address each grouping in turn.[2]

Before reaching the disputed terms, however, the Court must determine the propriety of resolving indefiniteness at this point in the litigation. 4Web makes a passing reference in its Opening Brief to the idea that claim construction might be a premature stage for adjudicating indefiniteness. However, other than citing the broad proposition that the Court has discretion to defer ruling on indefiniteness until summary judgment, *see* Pl.'s Opening Br. at 12–13 (citing *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, No. 08cv335 IEG (NLS), 2008 WL 11333643, at *3 (S.D. Cal. July 14, 2008)), 4Web does not forcefully argue that the Court should invoke that discretion in this particular case. Regardless of whatever 4Web's somewhat elusive position is on the issue, the Court exercises its discretion to join its peers who have resolved indefiniteness at claim construction. *See, e.g.*, *Int'l Test Sols., Inc. v. Mipox Int'l Corp.*, No. 16-cv-00791-RS, 2017 WL 1367975, at *3 (N.D. Cal. Apr. 10, 2017) ("[A] court may find [a] term indefinite during claim construction, even in advance of any separate summary judgment motion." (first citing *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306 (Fed. Cir. 2008); and then citing *Interval Licensing, LLC v. AOL, Inc.*, 766 F.3d 1364, 1368–69

/ / /

---

[2] The Court notes that, although the Parties provide subtly different definitions for the POSITA with respect to the claims at issue, they agree that the differences are immaterial to the instant claim construction. *See* Pl.'s Opening Br. at 14 (citing each Party's expert's submissions). Neither Party disputed their agreement as to the materiality of the POSITA's credentials when invited to do so at the claim construction hearing.

12

(Fed. Cir. 2014))). With that threshold concern resolved, the Court now proceeds to a discussion of the disputed terms.

## I.    Microstrain Terms

The Microstrain Terms are all closely related, only varying as to the claimed parameter that accomplishes a specific function. Despite the Terms' similarities, the Court will recite the disputed terms in their entirety in the interests of completeness. The Microstrain Terms are as follows, with an emphasis on the disputed portions of the terms:

(1)    Wherein **a diameter and/or length of the struts and/or density of the web structure** are predetermined such that when the web structure is in contact with the bone at least a portion of the struts **create a microstrain** in adhered osteoblasts, bone matrix, or lamellar tissue;

(2)    Wherein **a diameter of the struts of the web structure** are predetermined such that when the web structure is in contact with the bone at least a portion of the struts **create a microstrain** in adhered osteoblasts, bone matrix, or lamellar tissue;

(3)    Wherein **a length of the struts of the web structure** are predetermined such that when the web structure is in contact with the bone at least a portion of the struts **create a microstrain** in adhered osteoblasts, bone matrix, or lamellar tissue;

(4)    Wherein **a density of the web structure** are predetermined such that when the web structure is in contact with the bone at least a portion of the struts **create a microstrain** in adhered osteoblasts, bone matrix, or lamellar tissue; and

(5)    Wherein **the diameter and/or length of the struts and/or density of the web structure** is predetermined so that the struts, under load, **create a microstrain**, in adhered osteoblasts, bone matrix, or lamellar tissue, wherein the microstrain is within a range that stimulates an **osteogenetic response**.

*See* Joint Claim Construction Hearing Worksheet ("Jt. Worksheet," ECF No. 110-2)

13

at 5–8.  These terms appear in Claims 1–2, 14–15, and 24–26 of the '845 Patent; Claims 1–2 of the '823 Patent; Claims 1–2 and 13–16 of the '669 Patent; and Claims 1–2 of the '756 Patent.[3]  *See id.*

### A.  *Parties' Arguments*

The essence of NuVasive's argument focuses on, as NuVasive sees it, the boundless nature of the claims.  The Microstrain Terms teach that a skilled artisan should predetermine certain parameters—including length, diameter, and density—but NuVasive says these parameters are too lacking in clarity because they go unaccompanied by sufficient guidance in the specification from which a skilled artisan may determine whether any particular web structure is covered.  In other words, whether it be the diameter of the struts, the length of the struts, or the density of the web structure, NuVasive argues a skilled artisan is left in doubt as to whether a certain set of predetermined parameters accomplishes the claims' intended function, i.e., creating a microstrain in adhered osteoblasts, bone matrix, or lamellar tissue, and/or stimulating an osteogenetic response.  Because of the "absence of any meaningful guidance," NuVasive contends the claims encompass an impermissible "zone of uncertainty" rendering the claims indefinite.  Def.'s Opening Br. at 13–14.

Where the specification does provide guidance as to the general range of parameters contemplated by the claims, NuVasive says the "ranges are effectively meaningless and illogical in the context of intervertebral spacers."  *Id.* at 13 (quoting Declaration of Mike Sherman ("Sherman Decl.") ¶ 37, ECF No. 113-11).  The specification teaches that "at least a portion of the struts are composed of struts having a length of 1 mm to 100 mm and the diameter ranging between 0.250 mm and 5 mm."  '845 Patent at col. 2:33–35.  But NuVasive's expert, Mr. Mike Sherman, believes these ranges are nonsensical because, at their upper limits, the ranges would result in implants

---

[3] Certain of the cited claims are unasserted, but they are claims from which other asserted claims depend.

24-CV-1021 JLS (MMP)

unable to perform their intended function as intervertebral spacers. *See* Sherman Decl.
¶ 37. Similarly, though the specification teaches that web structure densities at various
levels above 50% may be open, NuVasive contends the claims are indefinite because the
"specification does not correlate density with microstrain and does not explain how
microstrain can be achieved in the adhered osteoblasts," Def.'s Opening Br. at 14,
thereby leaving a POSITA "left to wonder what density of web structure would result in
the desired microstrain," *id.* (quoting Sherman Decl. ¶ 39). By "cover[ing] a result
without giving the skilled artisan guidance on how to achieve that result," NuVasive says
the claims are irredeemably defective.[4] *Id.* at 15 (citing *Int'l Test Sols., Inc. v. Mipox
Int'l Corp.*, No. 16-cv-00791-RS, 2017 WL 1367975 (N.D. Cal. Apr. 10, 2017)).

　　　4Web argues that NuVasive misunderstands the indefiniteness inquiry. The claims
need only allow the POSITA to "determine whether any specific embodiment [meets] the
'microstrain' limitations," according to 4Web, rather than recite a set of parameters that
will actually accomplish that function. Pl.'s Opening Br. at 17. 4Web argues that a
skilled artisan can make the determination of which set of parameters are covered by the
claims because "once a specific strut length, diameter, or density was selected," a
POSITA would then be capable of discerning "whether a 'microstrain' and 'osteogenetic
response' was achieved." *Id.*

/ / /

---

[4] On a certain level, NuVasive seems to argue that the Microstrain Terms do not enable a skilled artisan
to practice the claimed invention. *See* Def's Opening Br. at 15 ("Claims cannot, without more, cover a
result without giving the skilled artisan guidance on how to achieve that result."). When asked about
enablement at the claim construction hearing, NuVasive disclaimed an intent to dispute enablement,
though the Court was left troubled by counsel's repeated insistence that the patents fail to teach a skilled
artisan *how* to practice the invention. To the extent NuVasive advances the argument that the
Microstrain Terms are invalid under the enablement doctrine, it is an argument best left for another day,
if and when NuVasive chooses to raise it in earnest. *See Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*,
745 F.3d 1180, 1188 (Fed. Cir. 2014) ("To prove that a claim is invalid for lack of enablement, a
challenger must show by clear and convincing evidence that a person of ordinary skill in the art would
not be able to practice the claimed invention without 'undue experimentation.'" (citing *In re Wands*,
858 F.2d 731, 736–37 (Fed. Cir. 1988))).

1    In short, 4Web believes the Microstrain Terms are definite and should be given

2 their plain and ordinary meaning because "a [POSITA] knew what 'microstrain' and

3 osteogenetic response' were, and he/she also understood how to calculate and observe

4 both." *Id.* at 16. 4Web's expert, Mr. Troy Drewry, corroborates this understanding of

5 the state of knowledge in the art at the relevant time period, and 4Web argues that

6 Mr. Sherman, NuVasive's expert agrees. *Id.* at 17 (first quoting Rebuttal Declaration of

7 Troy Drewry ("Drewry Decl.") ¶ 32, ECF No. 114-2 Ex. 10; and then quoting Deposition

8 of Mike Sherman ("Sherman Dep.") at 32:13–20, ECF No. 114-2 Ex. 11). Because a

9 claim is definite so long as a skilled artisan "could determine whether or not an accused

10 product or method infringes the claim," 4Web asks the Court to find the Microstrain

11 Terms definite. *Id.* at 16 (first quoting *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,

12 30 F.4th 1339, 1347 (Fed. Cir. 2022); and then citing *Geneva Pharms., Inc. v.*

13 *GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003)).

14    **B.    Analysis**

15    "In construing claims, the analytical focus must begin and remain centered on the

16 language of the claims themselves . . . ." *Interactive Gift Exp., Inc. v. Compuserve Inc.*,

17 256 F.3d 1323, 1331 (Fed. Cir. 2001). In scrutinizing the language of the Microstrain

18 Terms at issue here, one feature of the claims jumps out, namely the prominent functional

19 limitation at their core. The Microstrain Terms all demand the selection of predetermined

20 parameters, i.e., diameter, length, and/or density, such that the combination results in a

21 microstrain and, with respect to certain of the claims, the combination further results in

22 an osteogenetic response. These are classic functional terms, which are "defined by what

23 [they do] rather than what [they are]." *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 39

24 (Fed. Cir. 2020). On this point, the Parties agree. *Compare* Pl.'s Resp. Br. at 2 ("[A

25 POSITA] could determine if the claimed implant meets the functional claim limitation."

26 (citing *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1009

27 (Fed. Cir. 2023))), *with* Def.'s Resp. Br. at 8 ("[E]ach of the [Microstrain Terms] is a

28 / / /

16

'functional' term 'defined by what it does rather than what it is.'" (citing *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008))).

But from there the Parties' views diverge. The Federal Circuit has "long held that nothing in the law precludes, for indefiniteness, 'defining a particular claim term by its function,'" *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017) (quoting *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374–75 (Fed. Cir. 2014)), but it has likewise cautioned that "the task of determining whether [a functional] limitation is sufficiently definite is a difficult one that is highly dependent on context (e.g., the disclosure in the specification and the knowledge of a person of ordinary skill in the relevant art area)," *Halliburton*, 514 F.3d at 1255. As one might expect, NuVasive highlights some of the tough cases where the Federal Circuit has found functional limitations indefinite. Those cases, however, do not help NuVasive overcome its heavy burden "to prove indefiniteness by clear and convincing evidence." *Fractus, S.A. v. TCL Corp.*, No. 2:20-CV-00097-JRG, 2021 WL 2983195, at *32 (E.D. Tex. July 14, 2021) (citing *Sonix*, 844 F.3d at 1377).

NuVasive begins by principally relying on *International Test Solutions, Inc. v. Mipox International Corporation*, but that case sheds little light on the instant claims. There, the court found indefinite the term "predetermined characteristics" where the term was used in reference to a cleaning pad such that the pad could clean probe elements without modification or damage. *Int'l Test*, 2017 WL 1367975, at *4. The court held the term was indefinite because it provided no objective baseline from which a skilled artisan could determine when the functional limitation, i.e., a clean probe, had been achieved. *Id.* The cleanliness level of the probe was untethered from objectivity because multiple "states of cleanliness may achieve the desired result." *Id.* Thus, achievement of the functional limitation was left up to the whim of the skilled artisan, who lacked a clear definition of when the functional limitation had been satisfied. *Id.* The court continued on to examine whether the rest of the intrinsic record clarified the boundaries of the claims, yet no clarification could be found. *Id.*

The Microstrain Terms are fundamentally distinct from those found indefinite in *International Test*. Here, unlike there, an objective baseline exists from which a skilled artisan could determine whether a set of predetermined parameters accomplish the functional limitations of creating a microstrain or creating an osteogenetic response. The specification offers exemplar ranges of what would constitute a microstrain, teaching that the predetermined parameters of the web structure would create a microstrain in "the adherent osteoblasts, bone matrix, or lamellar tissue, of between about $1\mu\varepsilon$ and about $5000\mu\varepsilon$, or between about $500\mu\varepsilon$ and $2000\mu\varepsilon$, or between about $1000\mu\varepsilon$ and about $1500\mu\varepsilon$." '845 Patent at col. 2:13–16. Similarly, the specification teaches that, when under load, an osteoblast produces BMPs, which "act as morphogenetic signals that signal the formation of bone (i.e., an osteogenetic response)." *Id.* at col. 14:7–8. The specification, thus, clarifies that the functional limitation of creating an osteogenetic response is one that is satisfied upon the creation of bone. Accordingly, "the intrinsic record provides an objective boundary for a skilled artisan," *Grace*, 57 F.4th at 1010, lending a definitive anchor to the functional limitations of the Microstrain Terms, the scope of which are left undisturbed by the "unpredictable vagaries of any one person's opinion," *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 635 (Fed. Cir. 2015) (quoting *Interval Licensing*, 766 F.3d at 1374). In contrast, the disputed term in *International Test* was dependent upon a subjective interpretation of when a probe was sufficiently clean.[5]

NuVasive goes on to argue that the various embodiments disclosed in the specification inject ambiguity into the claim scope, but this argument reads the claims too narrowly. The upper limits of the contemplated strut diameters and length, NuVasive

---

[5] For the same reason, NuVasive's cited cases invalidating claims as indefinite based on subjective functional limitations are inapposite. *See, e.g.*, *IBSA Institut Biochimique, S.A. v. Teva Pharms. USA, Inc.*, 966 F.3d 1374, 1378–79 (Fed. Cir. 2020) (interpreting the term "half-liquid"); *Berkheimer*, 881 F.3d at 1363 (interpreting the term "minimal redundancy"); *IQASR*, 825 F. App'x at 902–03 (interpreting the term "magnetic fuzz").

says, would be too large and "non-sensical in the context of intervertebral fusion spacers." Def.'s Opening Br. at 13. But as 4Web's expert points out, Drewry Decl. ¶ 34, the specification expressly contemplates using the implants in non-vertebral contexts, such as "corpectomy devices, knee replacements, hip replacements, long bone reconstruction scaffolding, and cranio-maxifacial implants foot and ankle, hand and wrist, shoulder and elbow (large joint, small joint, extremity as well as custom trauma implants)." '845 Patent at col. 3:52–57. Thus, the representative diameters, lengths, and densities do not sow confusion as to the claim scope but rather reinforce the notion that a broad range of parameters—appropriate for various medical applications—may accomplish the functional limitations of creating a microstrain and osteogenetic response. "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement," *Sonix*, 844 F.3d at 1377 (quoting *Invitrogen Corp v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005)), and the fact that, in this case, the patentee may have defined its claims with a broader scope than NuVasive would otherwise desire is not fatal, *see Niazi*, 30 F.4th at 1347 ("But a claim is not indefinite just because it is broad." (citing *BASF*, 875 F.3d at 1367)).

Because the claim scope is unambiguous from the intrinsic record alone, the Court need not consider the Parties' expert testimony regarding whether the Microstrain Terms recite an objective boundary, but the extrinsic record only strengthens that conclusion. *See GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 F. App'x 938, 941 n.3 (Fed. Cir. 2016) (citing *Profectus*, 823 F.3d at 1380) (declining to consider extrinsic evidence when "the asserted claims are not indefinite based on the clear intrinsic evidence"). 4Web's expert, Mr. Drewry, explained in his declaration that "[m]icrostrain is a well understood term that characterizes small changes in the dimensions of a material in response to force on the order of micrometers or millionths of a meter," Drewry Decl. ¶ 32, and NuVasive's expert, Mr. Sherman, agreed in his deposition that "the definition of micro-strain was understood as of the priority date of the patent in suit," Sherman Dep. at 31:7–10. Likewise, both experts agreed that an osteogenetic response would involve

19

the creation of bone tissue, which the Court finds to be an objective baseline from which to determine whether the functional limitation has been achieved.  *See* Drewry Decl. ¶ 38; Sherman Dep. at 50:5–18.  Accordingly, both experts effectively agree that a skilled artisan would understand when the functional limitation of the Microstrain Terms had been satisfied.  Nothing more is needed for the Court to reject NuVasive's primary indefiniteness challenge as to the Microstrain Terms.  *See Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1288 (Fed. Cir. 2023) (rejecting indefiniteness challenge "because a person of ordinary skill in the art would know when [the device] is large enough to accomplish the function identified in the patent.").

NuVasive recruits *Halliburton* and *Geneva Pharmaceuticals* in its Responsive Brief to call into doubt the proposition that a claim can overcome an indefiniteness challenge where its scope can be determined only *ex post*, Def.'s Resp. Br. at 7–8, a proposition 4Web does not deny that it relies on, Pl.'s Resp. Br. at 2–3.  But 4Web has the better of the arguments on that legal question.  In *Halliburton*, the Federal Circuit affirmed the lower court in invalidating certain claims because "the term 'fragile gel' was indefinite."  *Halliburton*, 514 F.3d at 1256.  In reaching that conclusion, the court rejected the patentee's proposed "three-part definition" of the term that required the gel to: 1) "easily transition[] to a liquid state upon the introduction of force . . . and return[] to a gel when the force is removed," and 2) be "capable of suspending drill cuttings and weighting materials."  *Id.* at 1250.  The court reviewed the specification and found the proposed definition indefinite as to the first element, in part, "because a [POSITA] could not determine how quickly the gel must transition to a liquid when force is applied and how quickly it must return to a gel when the force is removed."  *Id.* at 1254.  It went on to reject the second element as indefinite, in part, "because nothing in the record suggests what degree of such capability is sufficient."  *Id.*  Thus, the term "fragile gel" was determined to be indefinite largely because the patentee's proposed construction of the term included two functional limitations (i.e., *easily* transitioning to/from a liquid state and being *capable* of suspending drill cuttings and weighting materials) that could not be

20

objectively measured "by reference to the specification or other intrinsic evidence or by reference to extrinsic evidence." *See BASF*, 875 F.3d at 1366. This reasoning had little to do with the timing of when the functional limitations must be measured and much to do with the dearth of objective metrics for the skilled artisan to measure in the first place.

To bolster its conclusion, the *Halliburton* court cited *Geneva Pharmaceuticals* as another Federal Circuit case rejecting a patentee's proposed construction as indefinite. *Halliburton*, 514 F.3d at 1254–55 (citing *Geneva Pharms.*, 349 F.3d at 1384). There, the disputed term was "synergistically effective amount," which "[b]y its terms, . . . is a functional limitation." *Geneva Pharms.*, 349 F.3d at 1384. As read in the context of the claims at issue, the court said the disputed term "should encompass any dosage amount [of a pharmaceutical composition] that can achieve therapeutic synergy." *Id.* But the patentee sought "to read more into these claim terms to make the dosage range depend on the particular antibiotic and bacteria" such that "a formulation falls outside the scope of the claims if a given antibiotic, bacteria, and disease combination provides no synergy." *Id.* The court rejected that interpretation as indefinite because the claimed dosage amount was dependent upon which bacterium was chosen for analysis. *Id.* However, the court instead opted for a broader view of the disputed term, concluding that the "term 'synergistically effective amount' must mean any amount that is synergistic against any bacteria" such that the "fact that the same dosage amount does not yield synergy under other circumstances is irrelevant; once a particular amount yields synergy under any circumstance, that amount is 'synergistically effective.'" *Id.* This interpretation was held to be definite.

Rather than support NuVasive's argument that the Microstrain Terms are indefinite, *Geneva Pharmaceuticals*, properly understood, actually supports the view that the Microstrain Terms should be read broadly to encompass any combination of strut length, strut diameter, and web structure density that results in a microstrain in any

/ / /

/ / /

21

implant location.[6]  In other words, any set of predetermined web structure parameters that can be shown to satisfy the functional limitations in any particular setting is within the claim scope.   And because a skilled artisan can determine whether the functional limitations have been satisfied, "the patents provide reasonable certainty about the claimed inventions' scope," even if that determination cannot be made in advance.  *See Nevro*, 955 F.3d at 39 ("That a given signal will eliminate paresthesia in some patients, but not others, does not render the claims indefinite.").[7]   Indeed, the potential infringer need not "be able to determine if a process infringes before practicing the claimed process."   *See Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1372 (Fed. Cir. 2008) (citing *Invitrogen*, 424 F.3d at 1384); *see also Nevro*, 955 F.3d at 40.

Although NuVasive's frontline argument—described above—does not withstand scrutiny, NuVasive sets forth a somewhat refined objection in its Responsive Brief that, if supported by clear and convincing evidence, would have come closer to overcoming its burden to prove indefiniteness.  In contrast to its Opening Brief, where NuVasive argues the Microstrain Terms fail to recite objective boundaries, its Responsive Brief changes course by arguing that a POSITA would not, as a matter of fact, have the technical

---

[6] At least once before, the Federal Circuit has cautioned district courts against interpreting *Geneva Pharmaceuticals* in the way advocated for by NuVasive.  *See Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1372 n.12 (Fed. Cir. 2008).

[7] NuVasive accuses 4Web of overreading *Nevro* because, unlike there, "the patent specification gives no range of strut length, diameter, or density that delivers the microstrain taught by the claims.  And the skilled artisan could not 'quickly determine' whether the microstrain was transferred to any given patient's adhered cells or tissue."  Def.'s Resp. Br. at 8.  But contrary to NuVasive's assertion, the '845 patent does indeed provide representative ranges, *see* '845 Patent at col. 10:45–11:10, and NuVasive provides no argument that places an upper limit on how long is too long to determine whether infringement has occurred, *cf. Star Sci.*, 537 F.3d at 1372 n.12 ("And while we emphasized that a claim is indefinite if a skilled artisan cannot determine if an accused product infringes or not, we did *not* hold that the infringement determination must be able to be made at any particular time.").  The Court acknowledges that the process of determining whether the functional limitations have been met in this case might be an arduous one that proves difficult for 4Web when it comes time to prove infringement, but infringement is a question not implicated by claim construction.  *See Invitrogen*, 424 F.3d at 1384 ("Stratagene is really talking about the difficulty of avoiding infringement, not indefiniteness of the claim.").

aptitude to measure whether the functional limitations are satisfied. In other words, as NuVasive puts it, even if the concepts of microstrain and osteogenetic response are not inherently indefinite due to their ambiguous meaning, a POSITA still "cannot know whether the microstrain or osteogenetic result taught by the claims was achieved." Def.'s Resp. Br. at 7. On this point, the record as the Court finds it is uncomfortably bare, as the Parties solely rely on just snippets of expert testimony.

Mr. Sherman, NuVasive's expert, says that a POSITA would be unable, either pre-manufacture or post-implantation, to determine whether a preselected set of web structure parameters would create the microstrain or osteogenetic response as required by the Microstrain Terms' functional limitation. In regard to the pre-manufacturing stage, Mr. Sherman, in his deposition, described finite element analysis as "one tool in our arsenal in the design of spinal implants" to predict how an implant will react post-implantation, but he critiqued the imprecision of finite element analysis as providing an inadequate proxy for estimating high stress points in an implant design due to the built-in assumptions the analysis requires. Sherman Dep. at 10:5–18. In regard to the post-implantation stage, Mr. Sherman, again in his deposition, stated that he is "not exactly sure how you would [measure the microstrain] on an individual cell," characterizing the endeavor as "a PhD project." *Id.* at 37:3–21. He did, however, agree that a skilled artisan knew of a way to determine whether bone development had occurred. *Id.* at 51:6–13.

Mr. Drewry, 4Web's expert, exuded more optimism that a POSITA would be capable of determining whether the functional limitations of the Microstrain Terms had been accomplished. Like Mr. Sherman, Mr. Drewry explained that finite element analysis provides a simulation tool whereby "engineers can kind of work backwards" to determine what web structure parameters would result in a specific desired microstrain. Drewry Dep. at 27:3–28:5. Unlike Mr. Sherman, however, Mr. Drewry detailed the post-implantation method for measuring microstrain in adhered osteoblasts. Mr. Drewry explained that one can perform "serial sacrifices" on the implant target to monitor the

implant's progress over the course of several months.  He explained that one "would see the increased formation of the bone," and be "able to measure, calculate, and visually see this change in the osteoblast over time."  *Id.* at 14:6–15:3.  From this testimony, 4Web argues that a skilled artisan would "know[] how to calculate microstrain and observe an osteogenetic response."  Pl.'s Resp. Br. at 4.

"[A] claim is not indefinite if a person of skill in the art would know how to utilize a standard measurement method . . . to make the necessary measurement" for determining when a functional limitation has been met.  *See Presidio Components*, 875 F.3d at 1376.  Such a measurement method can be expressly disclosed in the specification, *see Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1317–19 (Fed. Cir. 2015), or a skilled artisan may rely on "an established method of measurement . . . even if that method is not set forth *in haec verba* in the patent itself," *see Presidio Components*, 875 F.3d at 1376 (quoting *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 809 F.3d 1223, 1224 (Fed. Cir. 2015) (Prost, C.J., Dyk & Wallach, JJ., concurring in the denial of the petition for rehearing en banc)).

NuVasive has not met its burden of proving by clear and convincing evidence that the Microstrain Terms fail to "delineate[] to a skilled artisan the bounds of the invention." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005). Mr. Drewry, 4Web's expert, stated in his declaration that a "person of ordinary skill in the art, at the time of the invention, would know how to measure or determine microstrain by known and conventional means."  Drewry Decl. ¶ 32.  Though arguably conclusory on those terms alone, Mr. Drewry went into considerable detail in his deposition as to what those known and conventional means are by explicating the "serial sacrifice" method of repeatedly taking measurements of the implant's progress over the course of several months.  *See* Drewry Dep. at 14:6–15:3.  Mr. Sherman, when asked about the skilled artisan's ability to perform these measurements, expressed skepticism, stating he is "not exactly sure how you would do that on an individual cell" and calling it "a pretty significant effort."  Sherman Dep. at 37:14–21.  But other than express doubt

24

that a skilled artisan could perform the "serial sacrifice" method as described by Mr. Drewry, Mr. Sherman did not provide any rationale underlying his doubts or articulate in detail why Mr. Drewry is wrong. For that reason, the Court finds 4Web's expert to have prevailed in this underwhelming "battle of the experts," which has been implicated by the bare intrinsic record before the Court as to the existence of a standard method for measuring microstrain and observing an osteogenetic response. *See Takeda Phams. Co. v. Norwich Pharms., Inc.*, No. 20-8966 (SRC), 2022 WL 621041, at *2 (D.N.J. Mar. 3, 2022) (crediting one party's expert over the other where neither party "cite[s] any intrinsic evidence that sheds light on the issues in dispute"). Thus, the Court finds on this limited record that, as a factual matter, the "serial sacrifice" method described by Mr. Drewry is an established method for measuring the microstrain in an adhered osteoblast and for observing an osteogenetic response.[8]

As a last-ditch effort, NuVasive seems to suggest in its Responsive Brief that a subjective limitation should be read into the Microstrain Terms. Def.'s Resp. Br. at 2 (citing *TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, No. CV-09-01531-PHX-JAT, 2011 WL 98948, at *24 (D. Ariz. Jan. 12, 2011)). Citing *TriQuint*, NuVasive points to the claim language requiring the web structure parameters to be "predetermined such that" they result in the desired microstrain and osteogenetic response. *Id.* Thus, even if a skilled artisan was able to determine whether the functional limitations had been accomplished *ex post*, NuVasive argues the Microstrain Terms—based on their plain language—require the skilled artisan to select the web structure parameters in advance with the *ex ante* knowledge that web structure would indeed create a microstrain and

---

[8] Alternatively, NuVasive could have produced evidence suggesting that there are multiple measurement methods that would lead to inconsistent determinations of whether the functional limitations had been achieved. *See Dow*, 803 F.3d at 634 ("Because the methods do not always produce the same results, the method chosen for calculating the slope of strain hardening could affect whether or not a given product infringes the claims."); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015) (finding claim indefinite where there were multiple methods for calculating "molecular weight" and the intrinsic record failed to inform the skilled artisan with reasonable certainty as to the proper method as claimed). No such evidence has been produced.

osteogenetic response. *Id.* at 4. That knowledge, says NuVasive, would evade the skilled artisan presumably due to, as Mr. Sherman sees it, the shortcomings of finite element analysis, which both experts agree is the method engineers typically use to design medical implants. *Id.*

The Court is not persuaded. True, the court in *TriQuint* did construe a disputed claim term with the language "are selected . . . such that" in a way that found "some design intent [to be] required," *see TriQuint*, 2011 WL 98948, at *24, but that construction contravenes the Federal Circuit's guidance to avoid injecting the accused infringer's subjective intent into patent claims. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001) ("We are not prepared to assign a meaning to a patent claim that depends on the state of mind of the accused infringer."); *see also Rowpar Pharms. Inc. v. Lornamead Inc.*, No. CV-13-01071-PHX-DGC, 2014 WL 1259777, at *9 (D. Ariz. Mar. 25, 2014) (rejecting proposed interpretation of claim term that "focus[ed] on the intent of the manufacturer or users of the accused product, which is improper during claim construction"). Regardless, the *TriQuint* court did not even consider an indefiniteness argument related to the disputed term, so the Court is left puzzled as to what significance NuVasive is attributing to that case. In the event NuVasive is proposing an alternative construction reflecting the imposition of a subjective limitation into the Microstrain Terms, no such proposal is before the Court. But even if it was, the Court nevertheless gives the Microstrain Terms their plain and ordinary meaning, which imposes only the temporal requirement that the web structure parameters, i.e., length/diameter/density, must be affirmatively selected prior to the inducement of a microstrain or an osteogenetic response. No *ex ante* knowledge of infringement is required. *See Nevro*, 955 F.3d at 40 ("Definiteness does not require that a potential infringer be able to determine *ex ante* if a particular act infringes the claims."). This approach is consistent with that of other courts to have considered how to properly construe the term "predetermined." *See, e.g.*, *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*,

350 F.3d 1327, 1340 (Fed. Cir. 2003) ("The ordinary meaning of 'predetermine' is 'to determine beforehand.'" (quoting *Webster's Third New International Dictionary* 1786 (1966))); *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1118 (Fed. Cir. 2011) ("The district court properly held that the predetermined event must be a condition chosen in advance . . . .").

In sum, NuVasive has not met its burden to prove by clear and convincing evidence that the Microstrain Terms fail to inform with reasonable certainty those skilled in the art about the scope of the invention. *See Teva*, 789 F.3d at 1345. Accordingly, the Court does not find the Microstrain Terms indefinite.

## II.    Central Portion Term

The term "central portion of the implant" appears in Asserted Claim 1 of the '421 Patent and Asserted Claim 1 of the '226 Patent. *See* Jt. Worksheet at 4, 9.

### A.    *Parties' Arguments*

With respect to the Central Portion Term, NuVasive argues that "'central portion' is an abstract concept and can mean different things to different artisans." Def.'s Opening Br. at 24 (quoting Sherman Decl. ¶ 44). NuVasive looks to the examples in the specification for guidance, but it finds the non-limiting examples so lacking in clarity that a skilled artisan would be unable to "understand where the central portion of the implant begins and ends." *Id.* For instance, NuVasive points to Figure 5B as an example spacer but contends that "not all spacers look like this or have similar strut configuration." *Id.* Thus, the various descriptions found in the specification as to what may constitute the "central portion" are inadequate for a skilled artisan to understand the scope of the claims, resulting in NuVasive's request to find the Central Portion Term indefinite. *Id.*

On the other hand, 4Web argues the term "central portion" had "a known and established meaning as of the priority date and describes the region in the middle of the implant (i.e., middle 50% of the implant)." Pl.'s Opening Br. at 20. Also relying on Figure 5B, 4Web highlights language in the specification confirming that "the central portion may be 50% of the height, length, and width from the center portion of the

27

implant." *Id.* at 21 (quoting Drewry Decl. ¶ 46).  All that is required to locate the central portion of the implant is to "find[] the 'central point' of the implant and then 'go out 50 percent [from] the middle of the implant.'" *Id.* (quoting Drewry Dep. at 75:18–76:3).

### B.    Analysis

As to the Central Portion Term, NuVasive has satisfied its burden to prove with clear and convincing evidence that "the intrinsic evidence provides [no] objective boundaries to the scope of the term." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019) (citing *Interval Licensing*, 766 F.3d at 1371).  Even when a claim term lacks "a precise numerical measurement," the term may be definite where "the intrinsic evidence . . . provides 'a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine [the scope of the claims]." *Enzo*, 599 F.3d at 1335 (quoting *In re Marosi*, 710 F.2d 799, 803 (Fed. Cir. 1983)).  Indeed, "a patent which defines a claim phrase through examples may satisfy the definiteness requirement." *Interval Licensing*, 766 F.3d at 1373.  However, where, as here, "contradictory examples in the specification introduce ambiguity to an otherwise clear term," the term is rendered indefinite. *IQASR*, 825 F. App'x at 906.

To make their arguments, both Parties rely on Figure 5B of the '421 Patent, pictured below:



FIG. 5B

Figure 5B illustrates an embodiment of the implant whereby "[s]ome struts extend through central portion 501a and/or 501b of implant 100." '421 Patent at col. 10:24–26.

28

As 4Web explains, in some instances, the "central portion" may need to deviate from the middle 50% of the implant "to account for irregular implant shape or implants with lordosis (i.e., varied height)." Pl.'s Resp. Br. at 5–6 (Drewry Decl. ¶ 46). Thus, "[i]n some embodiments, central portion 501a may include a rectangular region that has a width of approximately 50% of the implant width, a height of approximately 50% of the implant height, and a length of approximately 50% of the implant length and located in the center of implant 100." '421 Patent at col. 10:27–32. Meanwhile, in other embodiments, the "central portion 501b may encompass a region (e.g., a spherical region, square region, etc.) of approximately a radius of approximately 1/8 to 1/4 of the width of implant 100 around a position located approximately at one half the width, approximately one half the length, and approximately one-half the height of implant 100 (i.e., the center of implant 100)." *Id.* at col. 10:32–38.

What is clear from the specification is that, due to the various shapes of implants, various central portions are contemplated. *See id.* at col. 10:38–39. What is less clear from the specification is what the scope of the "central portion" is in any given implant. For example, as described above, the specification expressly contemplates a "square region . . . of approximately a radius of approximately 1/8 to 1/4 of the width of implant 100," '421 Patent at col. 10:33–35, but just a few lines down, the specification also expressly contemplates a "square region with a length of one of the sides of the square region approximately 1/4 to 1/2 the width of implant 100 around a position approximately at one half the width, approximately one half the length, and approximately one half the height of the implant." *Id.* at col. 10:40–44. The specification, thus, teaches that the "central portion" may be a square region with sides ranging from anywhere between one-eighth of the width of the implant up to one-half of the width of the implant, but it provides no clarity as to how a skilled artisan should decide where to land on that spectrum. Although "[i]n some cases, non-limiting examples provide sufficient information to allow a skilled artisan to infer the bounds of a term or to eradicate any latent ambiguity in a term," this is not one of those cases. *See*

*IQASR*, 825 F. App'x at 906 (citing *Interval Licensing*, 766 F.3d at 1373).

4Web's expert Mr. Drewry cites a passage from the specification to demonstrate "how the specification teaches that the 'central portion' shifts based on the 'size and shape of the implant.'  Pl.'s Resp. Br. at 5 (citing Drewry Decl. ¶ 46).  Mr. Drewry explains that, "in some instances the central portion may be 50% of the height, length, and width from the center of the implant, while in other instances . . . the central portion may be less than 50% of the implant in some or all dimensions."  Drewry Decl. ¶ 46 (citing '421 Patent at col. 10:45–57).  But Mr. Drewry's general observation that the "central portion" may be different sizes in different implants sheds no light on how a skilled artisan is to know whether any specific implant fits the mold.  Here, "the specification is at best muddled, leaving one unsure of" how large the "central portion" of the implant is in any given device.  *See Interval Licensing*, 766 F.3d at 1372.  The "litany of 'may[s]'" found in the specification are insufficient to allow a skilled artisan to determine the objective bounds of the Central Portion Term with reasonable certainty.  *See Int'l Test*, 2017 WL 1367975, at *5.

Because the intrinsic evidence is ambiguous as to the scope of the Central Portion Term and the ambiguity is not cured by Mr. Drewry's expert testimony, the Court finds the Central Portion Term indefinite.

## III.    Substantially Parallel Term

The term "substantially parallel" appears in Claims 1, 14–15, and 24–26 of the '845 Patent; Claims 1 and 16–17 of the '669 Patent; Claims 1–3 of the '756 Patent; Claims 1–3 of the '823 Patent; Claim 1 of the '516 Patent; and Claim 1 of the '421 Patent.[9]  *See* Jt. Worksheet at 2–5.

/ / /

/ / /

---

[9] Certain of the cited claims are unasserted, but they are claims from which other asserted claims depend.

**A.    Parties' Arguments**

As NuVasive sees it, the phrase "substantially parallel" is a term of degree that requires objective boundaries, yet no objective boundaries constrain the term when viewed in light of the record.  Def.'s Opening Br. at 21 (citing *Berkheimer*, 881 F.3d at 1364).  Put differently, the word "substantially" must be doing some work in the term "substantially parallel"; otherwise "the term 'substantially' would be rendered superfluous, and claims should not be construed to render terms meaningless."  *Id.* at 22 (citing *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021)).  However, NuVasive argues the specification provides no limits as to "[h]ow close to parallel is 'substantially parallel,'" and its expert, Mr. Sherman, agrees that "the ambiguity in the term creates issues in the context of intervertebral spacers."  *Id.* (citing Sherman Decl. ¶ 51).  Thus, NuVasive contends the Substantially Parallel Term is indefinite.

In contrast, 4Web argues the term "substantially parallel" should be given its plain and ordinary meaning as understood in the engineering field.  Pl.'s Opening Br. at 22.  That is, two planes are "substantially parallel" if the planes are "parallel but allowing for some deviation."  *Id.*  4Web identifies portions of the specification using the term "substantially parallel" "in a manner consistent with its plain and ordinary meaning," suggesting that the "claim term merely accounts for limitations inherent in the fabrication of any medical device," *id.* at 24, and it cites to several cases that have rejected indefiniteness challenges to the term "substantially parallel."  *Id.* at 24–25 (first citing *Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, No. 17-269-RGA, 2018 WL 4627661, at *7 (D. Del. Sept. 27, 2018); and then citing *Maitland Co. v. Terra First Inc.*, No. 3:94-662-17, 1994 WL 773882, at *8 (D.S.C. Oct. 27, 1994)).

**B.    Analysis**

The Court agrees with 4Web that the Substantially Parallel Term is definite.  The Federal Circuit "has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim."  *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349,

1359 (Fed. Cir. 2012) (first citing *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001); and then citing *Andrew Corp. v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821 (Fed. Cir. 1988)).  That trend has held steady in the aftermath of *Nautilus*.  *See Mfg. Res. Int'l*, 2018 WL 4627661, at *7 ("The Federal Circuit has upheld the use of 'substantially' as a term of degree in several post-*Nautilus* cases.").  NuVasive has not provided clear and convincing evidence that the Court should hold otherwise.

That a skilled artisan would be able to determine the scope of the Substantially Parallel Term is clear from the intrinsic record alone.  The claims themselves recite the limitation that "at least one of the two or more planar truss units lies in a plane that is not substantially parallel to a plane of at least one or more of the other two or more planar truss units." '421 Patent at claim 1.  The specification provides further clarification by defining a "planar truss" as "a truss structure where all of the struts and nodes lie substantially within a single two-dimensional plane." *Id.* at col. 5:8–10.  That definition of "planar truss" is contrasted with the definition of a "space truss" as "a truss having struts and nodes that are not substantially confined in a single two-dimensional plane." *Id.* at col. 5:20–22.  These definitions evoke the clear distinction between planar truss units that are limited to two dimensions and space truss units occupying a third dimension.

NuVasive faults the patents for "the absence of any guidance on what constitutes 'substantially parallel,'" Def.'s Opening Br. at 23, but "words of approximation, such as 'generally' and 'substantially,' are descriptive terms 'commonly used in patent claims "to avoid a strict numerical boundary to the specified parameter."'" *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310–11 (Fed. Cir. 2003) (quoting *Ecolab*, 264 F.3d at 1367)).  The specification here may be textually agnostic as to what the precise upper bound of "substantially parallel" is, but courts routinely uphold as definite terms of degree like "generally" or "substantially" even when they do not specify limits with numerical precision.  *See ESCO Grp. LLC v. Deere & Co.*, No. 20-1679-WCB, 2023 WL 4199413, at *11 (D. Del. June 22, 2023) (explaining that

requiring "an exact numerical range of angles that could be considered 'substantially parallel'" would be a stricter standard "than the standard articulated by the Supreme Court and the Federal Circuit").  NuVasive points to nothing in the record to suggest why a skilled artisan would be unable to determine the claim scope here despite the absence of strict numerical limits.  *See Mfg. Res. Int'l*, 2018 WL 4627661, at *7; *Anchor Wall*, 340 F.3d at 1311 (finding the phrase "generally parallel" to be definite and that it "envisions some amount of deviation from exactly parallel").  Indeed, the Court itself can find nothing in the record that shows inconsistent usage of the Substantially Parallel Term or any other ambiguity as to how the Term is used.  *Cf. Everlight Elecs. Co. v. Walmart, Inc.*, 2024 WL 3174389, at *4 (W.D. Tex. June 25, 2024) (finding the term "not level" indefinite because the specification introduced ambiguity by teaching both embodiments that were level and embodiments that were not level).[10]

Accordingly, the Court rejects NuVasive's argument that the Substantially Parallel Term is indefinite.[11]  The Substantially Parallel Term shall be given its plain and ordinary meaning.  *See Maitland*, 1994 WL 773882, at *8 ("The term 'substantially parallel' means just that.").

/ / /

---

[10] NuVasive points to a single reference in the specification where the patent describes an embodiment in which the planar truss units are "not parallel to one another," purportedly evincing the specification's recognition of "the binary nature of 'parallel.'"  Def.'s Opening Br. at 22 (citing '516 Patent at col. 5:26–30).  Put differently, by omitting the "substantially" modifier in said reference, the specification acknowledges that two objects either are or are not parallel, obfuscating the meaning of the word "substantially" as found in the claims.  But that single embodiment is just one example of a space truss, and NuVasive does not explain how that example prevents a skilled artisan from understanding the objective boundaries of the term "substantially parallel," which is used in other parts of the specification.  *Cf. GE Lighting Sols.*, 663 F. App'x at 940 (finding the term "elongated" indefinite where the term "appears nowhere in the specification").

[11] The Substantially Parallel Term is not indefinite based on the clear intrinsic evidence, so the Court need not consider the Parties' extrinsic evidence.  *See GE Lighting Sols.*, 663 F. App'x at 941 n.3.  Thus, the Court also need not consider 4Web's argument that Mr. Sherman's expert testimony is unreliable because his testimony contradicts his own history of prosecuting patents with the term "substantially parallel."  *See* Pl.'s Resp. Br. at 9–10 (citing *Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1275 (Fed. Cir. 2017)).

# CONCLUSION

For the foregoing reasons, the terms in dispute are construed as follows:

| TERM | CONSTRUCTION |
|---|---|
| *"wherein a diameter and/or length of the struts and/or density of the web structure are predetermined such that when the web structure is in contact with the bone at least a portion of the struts create a microstrain in adhered osteoblasts, bone matrix, or lamellar tissue"*<br><br>(appears in: '845 Patent, Claims 1, 14 (unasserted), 15; '823 Patent, Claim 1 (unasserted); '669 Patent, Claims 1, 16 (both unasserted)); | Plain and ordinary meaning |
| *"The implant of claim 1, wherein a diameter of the struts of the web structure are predetermined such that when the web structure is in contact with the bone at least a portion of the struts create a microstrain in adhered osteoblasts, bone matrix, or lamellar tissue"*<br><br>(appears in: '845 Patent, Claim 24; '669 Patent, Claim 13); | Plain and ordinary meaning |
| *"The implant of claim 1, wherein a length of the struts of the web structure are predetermined such that when the web structure is in contact with the bone at least a portion of the struts create a microstrain in adhered osteoblasts, bone matrix, or lamellar tissue"*<br><br>(appears in: '845 Patent, Claim 25; '669 Patent, Claim 14); | Plain and ordinary meaning |
| *"The implant of claim 1, wherein a* | Plain and ordinary meaning |

34

| TERM | CONSTRUCTION |
|---|---|
| **density of the web structure is predetermined such that when the web structure is in contact with the bone at least a portion of the struts create a microstrain in adhered osteoblasts, bone matrix, or lamellar tissue"**<br><br>(appears in: '845 Patent, Claim 26; '669 Patent, Claim 15; '756 Patent, Claim 1 (unasserted)) | |
| **"wherein the microstrain is within a range that stimulates an osteogenetic response"**<br><br>(appears in: '845 Patent, Claim 2; '669 Patent, Claim 2; '756 Patent, Claim 2; '823 Patent, Claim 2) | Plain and ordinary meaning |
| **"central portion of the implant"**<br><br>(appears in: '421 Patent, Claim 1; '226 Patent, Claim 1) | Indefinite |
| **"substantially parallel"**<br><br>(appears in: '845 Patent, Claims 1, 14 (unasserted), 15, 24–26; '669 Patent, Claims 1, 16 (unasserted), 17; '756 Patent, Claims 1 (unasserted), 2–3; '823 Patent, Claims 1 (unasserted), 2–3; '516 Patent, Claims 1, 18; '421 Patent, Claim 1) | Plain and ordinary meaning |

**IT IS SO ORDERED.**

Dated: February 18, 2025

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

35